IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| CF INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **COMPLAINT**

Plaintiff, the United States of America ("United States"), by the authority of the Attorney

General of the United States, acting at the request of the Administrator of the United States

Environmental Protection Agency ("EPA"), by and through the undersigned attorneys, alleges as

follows:

## **NATURE OF THE ACTION**

1.      This is a civil action brought against CF Industries, Inc. ("CF Industries" or

"Defendant") pursuant to Sections 113(b) of the Clean Air Act ("CAA"), 42 U.S.C. § 7413(b).

This Complaint seeks the assessment of civil penalties for violations of the Prevention of

Significant Deterioration ("PSD") provisions of the CAA, 42 U.S.C. §§ 7470-92; Title V of the

CAA, 42 U.S.C. § 7661 *et seq.*; and the State Implementation Plan ("SIP") for the State of

Florida ("Florida") promulgated pursuant to Section 110 of the CAA, 42 U.S.C. § 7410. *See* Fla.

Admin. Code 62-212.400.

2.      This action is based upon violations that occurred at two sulfuric acid plants,

specifically the "C" and "D" sulfuric acid plants (hereinafter collectively "C and D SAPs")

which are part of a phosphate fertilizer manufacturing facility located at 10608 Paul Buchman

Hwy, Plant City, Florida (hereinafter "Plant City Facility") that was owned and operated by Defendant at the time of the violations. The C and D SAPs emit sulfur dioxide ("$SO_2$"), which is a regulated pollutant under the CAA, into the atmosphere.

## JURISDICTION, AUTHORITY AND VENUE

3.     This Court has jurisdiction over the subject matter of this action and the Defendant pursuant to Sections 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

4.     Authority to bring this action on behalf of the United States is vested in the U.S. Attorney General pursuant to Section 305(a) of the CAA, 42 U.S.C. § 7605(a), and 28 U.S.C. §§ 516 and 519.

5.     Venue is proper in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391 and 1395(a), because the violations that constitute the basis of this Complaint occurred in this District and the C and D SAPs are located in this District.

## NOTICES

6.     Pursuant to Sections 113(a)(1) and 113(b) of the CAA, 42 U.S.C. § 7413(a), (b), EPA has given notice of the violations and of this action to CF Industries and Florida more than thirty days prior to the filing of this Complaint.

## DEFENDANT

7.     Defendant CF Industries is incorporated under the laws of the State of Illinois headquartered in Illinois, and was doing business in the State of Florida at the Plant City Facility at the time of the violations. CF Industries sold the Plant City Facility on March 17, 2014 (hereafter, the "Facility Sale Date") and has not operated the plant since that time.

8.     CF Industries is a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

## STATUTORY AND REGULATORY BACKGROUND

9.     The Clean Air Act is designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

**A.     National Ambient Air Quality Standards**

10.     Section 108(a) of the CAA, 42 U.S.C. § 7408(a), requires the Administrator of EPA to promulgate a list of each air pollutant, emissions of which may reasonably be anticipated to endanger public health or welfare and the presence of which results from numerous or diverse mobile or stationary sources. Pursuant to Section 108(a), EPA has identified, *inter alia*, sulfur oxides (including $SO_2$) as such a pollutant. *See* 40 C.F.R. §§ 50.4 and 50.5 (effective May 22, 1996 through Aug. 22, 2010); *see also* 40 C.F.R. § 50.17 (effective Aug. 23, 2010).[1]

11.     Section 109(a) of the CAA, 42 U.S.C. § 7409(a), requires the Administrator of EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS") for those air pollutants ("criteria pollutants") for which air quality criteria have been issued pursuant to Section 108 of the CAA, 42 U.S.C. § 7408. The primary NAAQS are to be adequate to protect the public health with an adequate margin of safety, and the secondary NAAQS are to be adequate to protect the public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air. Pursuant to Section 109(a) of the CAA, EPA has promulgated primary and secondary NAAQS for sulfur oxides, including $SO_2$. 40 C.F.R. §§ 50.4 and 50.5 (effective May 22, 1996 through Aug. 22, 2010); 40 C.F.R. § 50.17 (effective Aug. 23, 2010).

---

[1]  The citations in this Complaint are to the statutes and regulations in place at the time that the alleged violations occurred. The provisions of 40 C.F.R. § 50 were amended, effective August 23, 2010, to include, *inter alia*, separate national primary ambient air quality standards for sulfur oxides ($SO_2$). *See* 40 C.F.R. § 50.17 (Aug. 23, 2010).

12.     Pursuant to Section 107(d)(1)(A) of the Act, 42 U.S.C. § 7407(d)(1)(A), each state is required to designate those areas, or districts, within its boundaries where the air quality attains the NAAQS, fails to attain the NAAQS, or cannot be classified due to insufficient data (unclassifiable). Designations that have been approved by EPA are set forth at 40 C.F.R. Part 81. An area that meets the NAAQS for a particular pollutant is an "attainment" area. An area that does not meet the NAAQS is a "nonattainment" area. An area that cannot be classified due to insufficient data is "unclassifiable."

**B.     State Implementation Plan**

13.     To achieve the objectives of the NAAQS and the CAA, Section 110(a) of the CAA, 42 U.S.C. § 7410(a), requires each State to adopt and submit to EPA for approval a plan that provides for the attainment and maintenance of the NAAQS in each air quality control region within each state. This plan is known as a State Implementation Plan ("SIP").

14.     In 1972, pursuant to Section 110 of the CAA, the State of Florida submitted to EPA for approval the "State of Florida Air Implementation Plan" (hereafter "Florida SIP"), detailing requirements for the attainment and maintenance of the NAAQS. On May 31, 1972, EPA approved the Florida SIP. *See* 37 Fed. Reg. 10858. Since its initial EPA approval, the Florida SIP has been amended, re-codified, and approved several times. *See, e.g.,* 46 Fed. Reg. 17020 (Mar. 17, 1981); 48 Fed. Reg. 52716 (Nov. 22, 1983); 59 Fed. Reg. 52916 (Oct. 20, 1994); 60 Fed. Reg. 2688 (Jan. 11, 1995); 64 Fed. Reg. 32346 (June 16, 1999); Fla. Dept. of Env. Protection, Air Regulation Timelines (CFR and FAC): Air Regulations Timelines 9-23-2019.xlsx, available at https://floridadep.gov/air/air-business-planning/documents/air-regulation-timelines-cfr-and-fac (last visited Sept. 24, 2019). These constitute Florida's "applicable implementation plan," within the meaning of Section 113(b) and 302(q) of the CAA, 42 U.S.C.

§§ 7413(b) and 7602(q), and are considered the "Florida SIP." *See* Fla. Admin. Code 62-212.400.

**C.     Prevention of Significant Deterioration ("PSD") Requirements**

**1.     <u>General Federal PSD Provisions</u>**

15.     Part C of Title I of the CAA, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process. 42 U.S.C. § 7470. These provisions are referred to herein as the "PSD program."

16.     The core of the PSD program is that "[n]o major emitting facility . . . may be constructed" or modified[2] unless various requirements are met. 42 U.S.C. § 7475(a). These requirements include obtaining a permit with emission limits, demonstrating that emissions will not contribute to a NAAQS violation, and applying "best available control technology" ("BACT")[3] to control emissions. *Id.*

---

[2] Section 169(2)(C) of the Act, 42 U.S.C. § 7479(2)(C), defines "construction" to include "modification" (as defined in Section 111(a) of the Act). "Modification" is defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a), to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

[3] "Best available control technology means an emissions limitation . . . based on the maximum degree of reduction for [the regulated] pollutant . . . which would be emitted from [the] major modification which the Administrator, . . . taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques . . . . for control of such pollutant." 40 C.F.R. § 52.21(b)(12). It is a case-by-case determination made for each individual permit.

17.     Section 169(1) of the CAA, 42 U.S.C. § 7479(1), designates sulfuric acid plants which emit or have the potential to emit one hundred tons per year ("tpy") or more of any pollutant to be a "major emitting facility."

18.     EPA promulgated regulations designed to implement the PSD program. These regulations are found at 40 C.F.R. § 52.21 and are referred to as the "PSD regulations."

19.     Sections 110(a) and 161 of the CAA, 42 U.S.C. §§ 7410(a) and 7471, require each state to adopt in its SIP an EPA-approved PSD program that contains emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality in areas designated as attainment or unclassifiable.

20.     A state may comply with Sections 110(a) and 161 by being delegated by EPA with the authority to enforce the federal PSD regulations set forth at 40 C.F.R. § 52.21, or by having its own PSD regulations, approved by EPA as part of the state's SIP, on the basis that the state's PSD provisions set forth in the SIP are at least as stringent as those set forth in the federal PSD regulations.

21.     After EPA approves a state's PSD program into the state SIP, the program requirements, like all SIP requirements, become federally enforceable pursuant to Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1).

**2.     <u>Florida's PSD Program</u>**

22.     Pursuant to Section 110(a) of the CAA, 42 U.S.C. § 7410(a), the State of Florida has adopted and submitted to EPA for approval various rules for the attainment and maintenance of the NAAQS. Florida's proposed PSD rule was given final approval by EPA into the Florida SIP on December 22, 1983. The approval transferred to the State of Florida Department of Environmental Protection ("FDEP") the legal authority to process and issue PSD permits to sources in Florida that are required to obtain PSD permits.

23.     The Florida SIP has PSD provisions that are applicable to this action and closely mirror the federal PSD regulations codified at 40 C.F.R. § 52.21. *See* Fla. Admin. Code 62-212.400.

**3.     Applicable PSD Requirements**

24.     The Florida SIP, which includes the PSD program, was conditionally approved in 1980, and amended, recodified, and approved as part of the federally approved SIP numerous times, including in 1981, 1983, 1994, 1995, 1999, 2006, 2007, 2008, 2011, and 2012. Some portions of the Florida SIP such as Fla. Admin. Code 62-210.200 were amended multiple times per year. The 2006 amendment saw a major overhaul to the applicable Florida SIP requirements. The provisions applicable to the allegations in this Complaint did not substantively change between the 2006 amendment and amendments thereafter.

*i.     Florida SIP PSD Requirements Prior to February 1, 2006*

25.     Under the Florida SIP applicable to the allegations in this Complaint through February 1, 2006, the criteria for establishing whether a modification to an existing major facility is subject to preconstruction review is set forth in Fla. Admin. Code 62-212.400(2) (effective through Feb. 1, 2006). The specific criteria for modifications to major facilities are set forth in Fla. Admin. Code 62-212.400(2)(d)4. (effective Nov. 1, 1981 through Feb. 1, 2006).

26.     Pursuant to Fla. Admin. Code. 62-212.400(2)(d)4.a. (effective Nov. 1, 1981 through Feb. 1, 2006),

> [A] proposed modification to a major facility shall be subject to the preconstruction review requirements of this rule if:
>
> (i)     The facility to be modified would be subject to preconstruction review requirements pursuant to Rule 62-212.400(2)(d)2., F.A.C., if it were itself a proposed new facility; and
>
> (ii)    The modification would result in a significant net emissions increase (as set forth in Rule 62-212.400(2)(e)2., F.A.C.) of any pollutant regulated under the Act; or the facility to be modified is located within 10

7

kilometers of a Class I area and the modification would result in a net emissions increase (as set forth in Rule 62-212.400(2)(e)1., F.A.C.) of any pollutant regulated under the Act, which increase would have an impact on any Class I area equal to or greater than 1.0 microgram per cubic meter (24-hour average).

27.     Fla. Admin. Code. 62-212.400(2)(d)2. (effective Nov. 1, 1981 through Feb. 1, 2006) sets forth the criteria for New Major Facilities. Pursuant to this subsection,

a proposed new major facility shall be subject to the preconstruction review requirements of this rule if:

a.      For any pollutant regulated under the Act, except for lead, the sum of the quantifiable fugitive emissions and the potential emissions of all emissions units at the facility which have the same "Major Group" Standard Industrial Classification (SIC) Code (as described in the Standard Industrial Classification Manual, 1972, as amended by the 1977 Supplement . . . ) would be equal to or greater than 250 tons per year; or

b.      For any pollutant regulated under the Act, except for lead, the sum of the quantifiable fugitive emissions and the potential emissions of all emissions units at the facility which have the same "Major Group" Standard Industrial Classification (SIC) Code would be equal to or greater than 100 tons per year; and the facility would belong to any of the facility categories listed in Table 212.400-1, Major Facility Categories . . . .

28.     Sulfuric acid plants are listed in the Standard Industrial Classification ("SIC") code under Major Group 28, Industrial Group 281, Industrial Number 2819. Executive Office of the President Office of Management and Budget, STANDARD INDUSTRIAL CLASSIFICATION MANUAL, 132-34 (1972 & 1977 Supp.).

29.     Sulfuric acid plants are listed in the facility categories in Table 212.400-1 of the Florida Admin. Code (effective Nov. 1, 1981 through Feb. 1, 2006).

30.     The threshold for a "significant net emissions increase" of $SO_2$, as set forth in Fla. Admin. Code 62-212.400(2)(e)2. and Table 212.400-2 (effective Nov. 1, 1981 through Feb. 1, 2006), is 40 tpy.

31.     Thus, modifications of sulfuric acid plants would be subject to preconstruction review under the Florida PSD requirements effective through Feb. 1, 2006 if (1) the facility

would have been subject to PSD requirements if it were a new facility (having SO$_2$ emissions of greater than 100 tpy), and (2) the modifications would result in a significant net emissions increase of at least 40 tpy. *See* Fla. Admin. Code. 62-212.400(2)(d)4.a. (effective Nov. 1, 1981 through Feb. 1, 2006); 62-212.400(2)(d)2. (effective Nov. 1, 1981 through Feb. 1, 2006).

      32.     The preconstruction review requirements are set forth in Fla. Admin. Code 62-212.400(5), and include, *inter alia*, the following:

      a.     The modification "shall apply Best Available Control Technology (BACT) for each pollutant subject to preconstruction review requirements as set forth in Rule 62-212.400(2)(f), F.A.C." Fla. Admin. Code 62-212.400(5)(c) (effective Nov. 1, 1981 through Feb. 1, 2006) (*see also* 40 C.F.R. § 52.21(b)(12) and 42 U.S.C. § 7479(3)).

      b.     The owner or operator must demonstrate that the construction or modification, taken together with other increases or decreases of air emissions, will not violate applicable air quality standards. Fla. Admin. Code 62-212.400(5)(d) (effective Nov. 1, 1981 through Feb. 1, 2006); *see also* 40 C.F.R. § 52.21(k).

      c.     The application for a PSD permit must be accompanied by an analysis of ambient air quality in the area. Fla. Admin. Code 62-212.400(5)(f) (effective Nov. 1, 1981 through Feb. 1, 2006); 40 C.F.R. § 52.21(m).

      d.     Pursuant to Fla. Admin. Code 62-212.400(5)(h),

> [a]t a minimum, the owner or operator of the facility or modification shall provide[, *inter alia*,] the following information to the Department:
>
> 1. A description of the nature, location, design capacity and typical operating schedule of the facility or modification, including specifications and drawings showing its design and plant layout;
>
> 2. A detailed schedule for construction of the facility or modification;
>
> 3. A detailed description of the system of continuous emissions reduction proposed by the facility or modification as BACT, emissions estimates

and any other information as necessary to determine that BACT would be applied to the facility or modification;

4.   Information relating to the air quality impact of the facility or modification, including meteorological and topographical data necessary to estimate such impact; and

5.   Information relating to the air quality impacts of, and the nature and extent of, all general commercial, residential, industrial and other growth which has occurred since August 7, 1977, in the area the facility or modification would affect.

### ii.   *Florida SIP PSD Requirements Effective February 2, 2006 Through the Facility Sale Date*

33.   Under the Florida SIP applicable to the allegations in this Complaint from February 2, 2006 through the Facility Sale Date, the criteria for establishing whether a modification to an existing facility is subject to preconstruction review is set forth in Fla. Admin. Code 62-212.400 (effective February 2, 2006 through the Facility Sale Date).

34.   Specifically, "[n]o person shall . . . undertake any major modification except in compliance with the provisions of Rule 62-212.400, F.A.C." Fla. Admin. Code 62-212.400(1)(a) (effective Feb. 2, 2006 through March 27, 2012); *see also* Fla. Admin. Code 62-212.400(1)(a) (effective March 28, 2012 through the Facility Sale Date); 40 C.F.R. § 52.21(a)(1).

35.   Fla. Admin. Code 62-212.400(2)(a)1. (effective Feb. 2, 2006) sets forth the criteria for determining "whether a major modification will occur for [a] PSD pollutant" at an existing emissions unit as follows:

Baseline Actual-to-Projected Actual Applicability Test for Modifications at Existing Emissions Units. A significant emissions increase of a PSD pollutant will occur if the difference, or the sum of the differences if more than one emissions unit is involved, between the projected actual emissions and the baseline actual emissions equals or exceeds the significant emissions rate for that pollutant. . . .

36.   The "baseline actual emissions" used to determine an emissions increase differs based on whether the emissions unit is new or existing. For existing emissions units, the "baseline actual emissions" is "the average rate, in tons per year, at which the emissions unit

actually emitted the pollutant during any consecutive 24-month period selected by the owner or operator within the 10-year period immediately preceding the date a complete permit application is received by [FDEP]. . . ." Fla. Admin. Code 62-210.200 (hereinafter "Fla. Air Definitions");[4] *see also* 40 C.F.R. § 52.21(b)(48)(ii). For any new emissions unit, baseline actual emissions, after the initial construction and operation of the unit, "shall equal the unit's potential to emit." Fla. Air Definitions; *see also* 40 C.F.R. § 52.21(b)(48)(iii).

37.     "Projected actual emissions" is the "maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a PSD pollutant in any one of the 5 years following the date the unit resumes regular operation after the project, or in any of the 10 years following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit that PSD pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source." Fla. Air Definitions; *see also* 40 C.F.R. § 52.21(b)(41)(i).

38.     An "existing emissions unit" is any emissions unit which was "in existence, in operation, or under construction, or had received a permit to begin construction prior to January 18, 1972." Fla. Air Definitions; *see also* 40 C.F.R. § 52.21(b)(7)(ii).

39.     A "new emissions unit," for purposes of Fla. Admin. Code 62-212.400, is defined as "an emission unit which is not in existence, for which an application for a permit to construct has not been submitted before the effective date of an applicable section or provision, or which has been reclassified as a new emissions unit pursuant to any provision" of this Chapter. Fla. Air Definitions; 40 C.F.R. § 52.21(b)(7)(i).

---

[4] Fla. Admin. Code 62-210.200, which contains the definitions applicable to, *inter alia*, the Florida SIP and Title V provisions, was amended several times during the period relevant to the Complaint, including July 6, 2005; Feb. 1, 2006; Sept. 6, 2006; May 9, 2007; March 16, 2008; Oct. 12, 2008; March 11, 2010; Dec. 4, 2011; March 28, 2012; and October 23, 2013. This complaint uses the term "Fla. Air Definitions" to refer to any, all, or each of these iterations as applicable.

40. The "significant net emissions increase" or "significant emissions rate" for the purposes of determining emissions increase or net emissions increase is 40 tpy for $SO_2$. *See* Fla. Air Definitions; *see also* 40 C.F.R. § 52.21(b)(23)(i).

41. Thus, modifications of sulfuric acid plants would be subject to preconstruction review under the Florida PSD requirements effective Feb. 2, 2006 through the Facility Sale Date if they resulted in an increase of $SO_2$ emissions of 40 tpy or more. *See* Fla. Admin. Code 62-212.400 (versions effective Feb. 2, 2006 through the Facility Sale Date); Fla. Air Definitions; *see also* 40 C.F.R. § 52.21.

42. Florida's PSD requirements effective Feb. 2, 2006 through the Facility Sale Date are set forth in Fla. Admin. Code 62-212.400(4) through (13) and are similar to those set forth in the previous version of the administrative code. *See also* 40 C.F.R. § 52.21. They include, *inter alia*, the following:

a. Pursuant to Fla. Admin. Code 62-212.400(4),

The owner or operator of a proposed source or modification shall submit all information necessary to perform any analysis or make any determination required under this section. Such information shall include:

(a) A description of the nature, location, design capacity, and typical operating schedule of the source or modification, including specifications and drawings showing its design and plant layout;

(b) A detailed schedule for construction of the source or modification;

(c) A detailed description as to what system of continuous emission reduction is planned for the source or modification, emission estimates, and any other information necessary to determine best available control technology (BACT) including a proposed BACT;

(d) The air quality impact of the source or modification, including meteorological and topographical data necessary to estimate such impact and an analysis of "good engineering practice" stack height; and

(e) The air quality impacts, and the nature and extent of any or all general commercial, residential, industrial, and other growth which has

occurred since August 7, 1977, in the area the source or modification would affect.

(effective Feb. 2, 2006); *see also* 40 C.F.R. § 52.21(n).

        b.      The owner or operator must demonstrate that the construction or modification, taken together with other increases or decreases of air emissions, will not violate applicable air quality standards. Fla. Admin. Code 62-212.400(5) (effective Feb. 2, 2006); *see also* 40 C.F.R. § 52.21(k).

        c.      The application for a PSD permit must be accompanied by an analysis of ambient air quality in the area. Fla. Admin. Code 62-212.400(7) (effective Feb. 2, 2006); *see also* 40 C.F.R. § 52.21(m).

43.      Additionally, if a new major source of pollution or modification requires an air construction permit, it must comply with the requirements set forth in Fla. Admin. Code 62-210.300 (Permits Required). These include but are not limited to providing to FDEP sufficient information so that the permit: "1. specif[ies] the manner, nature, volume, and frequency of the emissions permitted, and the applicable emission limiting standards or performance standards, if any;(2. require[s] proper operation and maintenance of any pollution control equipment by qualified personnel . . .; [and] 3. contain[s] an effective date stated in the permit which shall not be earlier than the date the final action is take on the application . . . ." Fla. Admin. Code 62-210.300(2)(a) (effective Feb. 2, 2006 through the Facility Sale Date); *see also* 40 C.F.R. § 52.21.

**D.    Title V**

44.      Title V of the CAA, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources." The purpose of Title V is to ensure that all "applicable requirements" that a source is subject to under the CAA, including PSD and SIP requirements, are collected in one permit.

45.     Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32250 (July 21, 1992). These regulations are codified at 40 C.F.R. Part 70.

46.     The State of Florida has an EPA-approved Title V program and is authorized to issue and enforce Title V permits. *See* 40 C.F.R. Part 70 Appendix A. Pursuant to Appendix A of Part 70, Florida's Title V program was given interim approval by EPA on September 25, 1995 (60 Fed. Reg. 49343), and became effective on October 25, 1995. EPA gave final approval to the program on October 1, 2001 (66 Fed. Reg. 49837), and it became effective on October 31, 2001. The state's Title V regulations are codified at Fla. Admin. Code 62-213 (Operation Permits For Major Sources of Air Pollution). In all respects relevant to this Complaint, Florida's Title V regulations that are applicable to this action closely mirror the federal Title V regulations codified at 40 C.F.R. Part 70. *See generally* Fla. Admin. Code 62-213.

47.     "Major source of air pollution" or "Title V Source" is defined as, *inter alia*, "an emissions unit or group of emissions units, all belonging to the same two-digit Major Group as described in the Standard Industrial Classification Manual, 1987, that directly emits or has the potential to emit, 100 tons per year or more of any regulated air pollutant." Fla. Air Definitions; 42 U.S.C. §§ 7602(j) and 7661(2); 40 C.F.R. § 70.2.

48.     Sulfuric acid plants are listed in Major Group 28 in the Standard Industrial Classification Manual, 1987, at pages 134-35. $SO_2$ is a regulated air pollutant. *See* Fla. Air Definitions; 40 C.F.R. §§ 50.4 and 50.5 (effective May 22, 1996 through Aug. 22, 2010); *see also* 40 C.F.R. § 50.17 (effective Aug. 23, 2010); 40 C.F.R. § 52.21(b)(1)(i)(a).

49.     Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and the federal implementing regulations at 40 C.F.R. § 70.1(b), and Fla. Admin. Code 62-213.400 make it unlawful for any

person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V.

50.     Section 504(a) of the CAA, 42 U.S.C. § 7661c(a), the implementing regulations at 40 C.F.R. § 70.6(a), and Fla. Admin. Code 62-213.420 require that each Title V permit include, among other things, enforceable emission limitations and such other conditions as are necessary to assure compliance with "applicable requirements" of the CAA and the requirements of the relevant SIP. "Applicable requirement" is defined to include any relevant PSD requirements. 40 C.F.R. § 70.2; Fla. Air Definitions.

51.     Section 503(d) of the CAA, 42 U.S.C. § 7661b(d), the implementing regulations at 40 C.F.R. § 70.5(a), and Fla. Admin. Code 62-213.420 require any owner or operator of a source subject to Title V permitting requirements to submit a timely and complete permit application which includes sufficient information for the permitting authority to evaluate the subject source and applicable requirements. 40 C.F.R. § 70.5(a)(2).

52.     Under 40 C.F.R. § 70.5(b) and Fla. Admin. Code 62-213.420, any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.

**E.     Enforcement Provisions**

53.     Sections 113(a)(1) and (3) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (3), provide that the Administrator of EPA may bring a civil action in accordance with Section 113(b) of the CAA whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any other requirement or prohibition of, inter alia: (1) the PSD requirements of Section 165(a) of the CAA, 42 U.S.C. §

7475(a), or any rule promulgated thereunder; (2) Title V of the CAA, 42 U.S.C. §§ 7661-7661f, or any rule or permit issued thereunder; or (3) a SIP or any permit issued thereunder.

54.     Any owner or operator of a new major stationary source or modification subject to Fla. Admin. Code 62-212.400 who constructs or operates a source not in accordance with a PSD permit application or commences construction without applying for and receiving approval thereunder is subject to an enforcement action. 42 U.S.C. § 7413(b); 40 C.F.R. § 52.21(r)(1).

55.     40 C.F.R. § 52.23 provides, *inter alia*, that any failure by a person to comply with any provision of 40 C.F.R. Part 52, or with any approved regulatory provision of a SIP, shall render such person in violation of the applicable SIP and subject to enforcement action pursuant to Section 113 of the CAA.

56.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Administrator of EPA to initiate a judicial enforcement action for a permanent or temporary injunction and/or for a civil penalty of up to $32,500 per day for each violation occurring on and after March 15, 2004 through January 12, 2009, and $37,500 per day for each violation occurring after January 12, 2009 through November 2, 2015, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Pub. L. 101-410), as amended by the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701 note; Pub. L. 104-134) and the Federal Civil Penalties Inflation Adjustment Act Improvement Act of 2015 (28 U.S.C. § 2461 note; Pub. L. 114-74, Section 701). *See* 40 C.F.R. Part 19, 69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg. 75346 (Dec. 11, 2008); 78 Fed. Reg. 66643 (Dec. 6, 2013); and 83 Fed. Reg. 1190 (Jan. 10, 2018).

## **GENERAL ALLEGATIONS**

57.     At all relevant times, the C and D SAPs were sulfuric acid plants that emit more than 100 tpy of $SO_2$. At all relevant times, the C and D SAPs were existing "major stationary

sources" and "major emitting facilities" within the meaning of the CAA, the PSD regulations, and the state SIP, and "major sources" within the meaning of Title V of the CAA and the state's Title V permit program, because they were sulfuric acid plants which emit more than 100 tpy of a criteria pollutant (*i.e.*, $SO_2$, among others). *See* 42 U.S.C. §§ 7479(1), 7412(a)(1), & 7661(2); 40 C.F.R. §§ 52.21(b)(1)(i)(a) & 70.2; Fla. Air Definitions.

58.    At all times relevant to the Complaint prior to October 4, 2013, the Plant City Facility was located in an area designated as an attainment area for all criteria pollutants, including $SO_2$.

59.    At relevant times, Defendant produced sulfuric acid at the C and D SAPs.

60.    On June 16, 2010, in accordance with Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1), EPA issued to the Defendant and copied to FDEP a Notice of Violation alleging violations of the PSD and Title V permit requirements described above.

## SPECIFIC ALLEGATIONS

### A.    Permit Issuance

61.    In 1991, FDEP issued an air construction permit to the Defendant authorizing sulfuric acid production from each of the C and D SAPs at a rate of 2,600 tons per day ("tpd') with an $SO_2$ emission limit of 4 pounds of $SO_2$ per ton of sulfuric acid produced.

62.    In the years subsequent to the issuance of the 1991 permit, the C and D SAPs were not able to consistently achieve the permitted production level, and the C and D SAPs each operated at closer to 2,300 tpd.

### B.    2004 Permit and 2005 Modification

63.    In 2003, Defendant developed a plan to modify the C and D SAPs to install a cesium catalyst which was expected and intended by Defendant to increase sulfuric acid

production from approximately 2,300 tpd of sulfuric acid produced to the permitted level of 2,600 tpd.

64.     In January 2004, the Defendant submitted an application to FDEP requesting a PSD permit to implement the modification project, however, Defendant's application requested to modify the C and D SAPs to increase production to 2,750 tpd of sulfuric acid produced, rather than 2,600 tpd as set forth in the Defendant's modification plan.

65.     With its 2004 permit application, Defendant presented to FDEP guarantees from cesium catalyst vendors that $SO_2$ emissions at the C and D SAPs would not exceed 3.5 pounds/ton of sulfuric acid produced. Defendant did not present to FDEP information provided by the vendors showing that the expected emissions rate was significantly lower, ranging from around 2 pounds/ton to 3 pounds/ton of sulfuric acid produced.

66.     Based on the incomplete and/or inaccurate information that Defendant provided to FDEP concerning the expected sulfuric acid production rates and $SO_2$ emissions rates that would result once the modification was implemented, FDEP issued Final Permit No. PSD-FL-339 in June 2004 (hereinafter, the "2004 Permit") that set the production rates for the C and D SAPs at 2,750 tpd sulfuric acid, and set the BACT emissions rate for the C and D SAPs at 3.5 pounds $SO_2$/ton of sulfuric acid produced.

67.     The modification work that Defendant undertook pursuant to the 2004 Permit was completed at the C SAP in June 2004 and at the D SAP in February 2005. After this work was completed, the SAPs generally achieved Defendant's expected sulfuric acid production rate of approximately 2,600 tpd, but did not achieve the permitted production rate of 2,750 tpd.

68.     On September 2, 2005, Defendant approved a project to install new blower fans at the C and D SAPs. The project was anticipated to result in a significant increase in sulfuric acid production and a corresponding $SO_2$ emissions increase.

69.     However, Defendant did not submit an application to FDEP for PSD preconstruction review or a PSD permit under the CAA. Rather, on September 29, 2005, Defendant sent a letter to FDEP stating that despite having completed all the work under the 2004 Permit, the C and D SAPs had not been able to achieve the permitted rate of 2,750 tpd sulfuric acid, and would not be able to do so without the installation of new blower fans. Defendant asserted to FDEP that the new blower project was a part of, or a logical extension to, the project undertaken pursuant to the 2004 Permit, rather than a new and separate major modification. Defendant also acknowledged in the letter that replacement of the blower fans was not included in the list of proposed modifications described in Defendant's 2004 PSD permit application, but nevertheless requested an extension of time of the 2004 Permit until May 2007 to allow Defendant to install the blower fans. Defendant also asserted that there would be no potential for a significant emissions increase, which would require the project to undergo PSD review.

70.     In its September 2005 request for modification, Defendant failed to provide documents that it possessed to FDEP showing that the 2004 project to increase sulfuric acid production had been completed and closed, and the intended production level of 2,600 tpd attained. Likewise, Defendant did not disclose that the new blower fans were expected to achieve a sulfuric acid production rate beyond 2,900 tpd, rather than up to the permitted rate of 2,750 tpd. Finally, Defendant failed to disclose that the actual potential $SO_2$ emissions increase for the C and D SAPs for the blower project was 399 tpy, almost ten times more than the significance level of 40 tpy, the threshold for whether a project constitutes a major modification that required PSD review and a PSD construction permit.

71.     On December 21, 2005, based on the incomplete and/or inaccurate information that Defendant had provided, FDEP approved Defendant's request to extend the time to complete

the 2004 Permit work to allow Defendant to install the new blower fans, rather than requiring

PSD review and permitting.

72.    Likewise, Defendant did not amend its Title V permit to incorporate a BACT

emissions limitation for this project.

**C.    2007 Modification**

73.    On November 13, 2007, after Defendant had installed the first of two blower fans

at the C SAP, Defendant submitted a new application requesting modification of the 2004 Permit

to increase sulfuric acid production from 2,750 tpd to 2,995 tpd.

74.    On November 26, 2017, Defendant submitted a revised application, in which it

reduced the requested increase to 2,962 tpd.

75.    In the permit modification application, Defendant stated that because it also was

requesting a reduction in the permitted $SO_2$ emission rate for both the C and D SAPs from 3.5

pounds/ton of $SO_2$ per ton of sulfuric acid produced to 3.25 pounds/ton, there would be no $SO_2$

emissions increase, and thus the projects were not major modifications requiring PSD review.

76.    In the November 13, 2007 application, Defendant incorrectly asserted that the C

and D SAPs—which had been in operation since the mid-1980s—should be considered "new

emission units," as defined in Fla. Admin. Code 62-210.200(214) (effective May 9, 2007 through

March 15, 2008), which allows a facility to use the unit's potential-to-emit, rather than the unit's

pre-project actual emissions, calculated over a two year period which precedes the particular date

and which is representative of the normal operation of the emissions unit, to calculate the unit's

potential emissions increase. *See* Fla. Air Definitions; 40 C.F.R. §§ 52.21(b)(48)(ii), (iii).

77.    Although in its revised application, Defendant no longer claimed the C and D

SAPs were "new emission units," Defendant nevertheless continued to use the 2004 permitted

20

emission rate of 3.5 pounds of SO2 per ton of sulfuric acid produced (*i.e.*, the SAPs' potential-to-emit) as the baseline rather than the actual emissions rates for the units.

78.     By using the C and D SAPs' 2004 permitted emission rates of 3.5 pounds $SO_2$ per ton of sulfuric acid produced, at the 2004 permitted level of 2,750 tons sulfuric acid per day (even though the units were only capable of producing around 2,600 tons per day, Defendant used as its baseline emission rate the inflated figure of 1,757 tpy $SO_2$ per SAP.[5]  Defendant's revised November 2007 permit modification application requested to increase sulfuric acid production to 2,962 tpd, at 3.25 pounds $SO_2$ per ton, which also equals 1,757 tpy $SO_2$ per SAP. By this calculation, Defendant asserted in its application that there was no net increase in potential $SO_2$ emissions, thus avoiding triggering the 40 tpy significance level to qualify as a "major modification" triggering PSD review.

79.     Defendant should have used the C and D SAPs' actual emissions rates as the baseline emission rate to calculate the net increase in potential $SO_2$ emissions:

   a.   For the C SAP, the annual average sulfuric acid produced for 2005-2006 was 936,425 tons. At the rate of 3.5 pounds $SO_2$/ton, the baseline $SO_2$ emission rate was over 1,600 tpy.

   b.   For the D SAP, the annual average for 2005-2006 was 853,551 tons sulfuric acid produced. At the rate of 3.5 pounds $SO_2$/ton, the baseline $SO_2$ emission rate was 1,494 tpy.

Fla. Air Definitions; 40 C.F.R. §§ 52.21(b)(48)(ii).

80.     By the correct calculation, the potential emissions increase for the C SAP was 118 tpy (1,757 tpy – 1,639 tpy), and the potential emissions increase for the D SAP was 263 tpy

---

[5] 2,750 tpd x 3.5 lbs/ton x 365 days ÷ 2,000 lbs/ton = 1,757 tons $SO_2$/yr

(1,757 tpy – 1,494 tpy). These exceed the 40 tpy significance threshold such that the requested increase in production should have been deemed a "major modification" requiring PSD review.

81.     Ultimately, because the Defendant did not correctly calculate the emissions increases or present all necessary and appropriate information to FDEP, the project to increase sulfuric acid production to 2,962 did not undergo PSD review and no new PSD permit was issued for the permit. Likewise, Defendant did not amend its Title V permit to incorporate a BACT emissions limitation for this project.

**FIRST CLAIM FOR RELIEF**
**(PSD Violation: Installation of Blower Fans without a PSD Permit)**

82.     Paragraphs 1 through 81 are realleged and incorporated herein by reference.

83.     In September 2005, after Defendant completed the work outlined in the 2004 Permit and the C and D SAPs met the intended sulfuric acid production level of 2,600 tpd, Defendant requested a permit modification to install blower fans at the C and D SAPs to increase production to 2,750 tpd.

84.     The potential $SO_2$ emissions increase for the C and D SAPs for the blower project was 399 tpy, almost ten times more than the significance level of 40 tpy, the threshold for whether a project constitutes a major modification requiring PSD review and BACT analysis.

85.     Defendant failed to undergo PSD review and BACT analysis prior to installing the blower fans, and therefore failed to meet the PSD requirements for these proposed modifications.

86.     As a result of this major modification, Defendant violated and was in continuous and ongoing violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21, and the corresponding Florida SIP for PSD, enforceable by EPA under Section 113 of the Act, 42 U.S.C. § 7413, and 40 C.F.R. § 52.23, by failing to undergo PSD review for the major modification, by failing to obtain a PSD permit, and meet other PSD requirements.

87.     Defendant's violations continued until it sold the Plant City Facility on March 17, 2014.

88.     The PSD violations set forth in paragraphs 83 through 87 above subject the Defendant to civil penalties of up to $32,500 per day for each violation occurring after March 15, 2004 through January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009 through November 2, 2015, pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701 note; Pub. L. 104-134) and the Federal Civil Penalties Inflation Adjustment Act Improvement Act of 2015 (28 U.S.C. § 2461 note; Pub. L. 114-74, Section 701). *See* 40 C.F.R. Part 19, 69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg. 75346 (Dec. 11, 2008); 78 Fed. Reg. 66643 (Dec. 6, 2013); and 83 Fed. Reg. 1190 (Jan. 10, 2018).

### SECOND CLAIM FOR RELIEF
### (PSD Violation: Increasing Production without a PSD Permit)

89.     Paragraphs 1 through 88 are realleged and incorporated herein by reference.

90.     In November 2007, decades after the C and D SAPs were constructed and began operating, Defendant requested a permit modification to increase sulfuric acid production capacity of the C and D SAPs from 2,750 to 2,962 tpd, stating that there would be no $SO_2$ emissions increase, and thus the projects were not major modifications requiring PSD review.

91.     To calculate the proposed zero net $SO_2$ emissions increase, Defendant used the SAPs' potential to emit, based on the 2004 permit limit of 1,757 tons $SO_2$ per year as a baseline, rather than the C and D SAPs' actual average yearly $SO_2$ emissions of 1,639 and 1,494 tpy, respectively.

92.     Using potential to emit as a baseline amount is permissible only for new emissions units. *See* Fla. Admin. Code 62-210.200(11)(a) effective Jan. 10, 2007 through Oct. 22, 2013); 40 C.F.R. § 52.21(b)(48)(ii).

93.     The C and D SAPs were existing units. Thus, their actual average emissions rates should have been used as a baseline. *See id.*

94.     The total potential $SO_2$ emissions increase from increasing production to 2,962, using the C and D SAPs' actual average emissions rates as a baseline, is 118 tpy and 263 tpy, respectively. This exceeds the 40 tpy significance threshold for determining whether a project is a major modification requiring PSD review.

95.     Defendant failed to meet the PSD requirements by not applying for, obtaining, or operating pursuant to a PSD permit for these proposed increases in production, which are major modifications under the Florida SIP.

96.     As a result of this major modification, Defendant violated and was in continuous and ongoing violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21, and the corresponding Florida SIP for PSD, enforceable by EPA under Section 113 of the Act, 42 U.S.C. § 7413, and 40 C.F.R. § 52.23, by failing to undergo PSD review for the major modification, by failing to obtain a PSD permit, and meet other PSD requirements.

97.     Defendant's violations continued until it sold the Plant City Facility on March 17, 2014.

98.     The PSD violations set forth in paragraphs 90 through 97 above subject the Defendant to civil penalties of up to $32,500 per day for each violation occurring after March 15, 2004 through January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009 through November 2, 2015, pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as

amended by the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701 note; Pub. L. 104-134) and the Federal Civil Penalties Inflation Adjustment Act Improvement Act of 2015 (28 U.S.C. § 2461 note; Pub. L. 114-74, Section 701). *See* 40 C.F.R. Part 19, 69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg. 75346 (Dec. 11, 2008); 78 Fed. Reg. 66643 (Dec. 6, 2013); and 83 Fed. Reg. 1190 (Jan. 10, 2018).

### THIRD CLAIM FOR RELIEF
### (Title V Violations)

99.      Paragraphs 1 through 98 are realleged and incorporated herein by reference.

100.     As set forth in Claim 1 above, Defendant modified the C and D SAPs at the Plant City Facility by installing blower fans, which constituted major modifications that required compliance with the applicable PSD and SIP regulations.

101.     Also as set forth in Claim 2 above, Defendant modified the C and D SAPs at the Plant City Facility to increase sulfuric production capacity from 2,750 to 2,962, which constituted major modifications that required compliance with the applicable PSD and SIP regulations.

102.     These modifications triggered the requirements to, *inter alia*, obtain PSD permits establishing emissions limitations that meet BACT requirements and to otherwise comply with the requirements of the PSD program. Defendant failed to satisfy these requirements.

103.     Defendant failed to submit complete and accurate applications for Title V operating permits for the modified C and D SAPs that identified all applicable requirements, accurately certified compliance with such requirements, and contained a compliance plan for applicable requirements for which the source was not in compliance (including the requirement to meet BACT pursuant to a determination under PSD).

104.     Defendant failed to obtain proper or adequate Title V operating permits for its C and D SAPs that contained proper emission limitations for $SO_2$ that met BACT.

105.    Defendant thereafter operated the C and D SAPs without meeting such limitations and without having a valid operating permit that required compliance with such limitations or that contained a compliance plan for all applicable requirements for which the source was not in compliance, in violation of Sections 502(a), 503(c), and 504(a) of the Act, 42 U.S.C. §§ 7661a(a), 7661b(c), and 7661c(a), and the federally enforceable Florida Title V operating program requirements.

106.    Defendant's violations continued until it sold the Plant City Facility on March 17, 2014.

107.    The Title V violations set forth in paragraphs 100 through 106 above subject the Defendant to civil penalties of up to $32,500 per day for each violation occurring after March 15, 2004 through January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009 through November 2, 2015, pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701 note; Pub. L. 104-134) and the Federal Civil Penalties Inflation Adjustment Act Improvement Act of 2015 (28 U.S.C. § 2461 note; Pub. L. 114-74, Section 701). *See* 40 C.F.R. Part 19, 69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg. 75346 (Dec. 11, 2008); 78 Fed. Reg. 66643 (Dec. 6, 2013); and 83 Fed. Reg. 1190 (Jan. 10, 2018).

**PRAYER FOR RELIEF**

WHEREFORE, based on the allegations set forth above, Plaintiff requests that this Court:

1.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), assess a civil penalty against Defendant for up to the amount provided by applicable law;

2.    Award the United States its costs and disbursements in this action; and

3.    Grant the United States any such further relief as this Court deems appropriate.

26

Respectfully submitted,

**ATTORNEYS FOR UNITED STATES OF AMERICA:**

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice


_____

RACHAEL AMY KAMONS
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington DC 20044
Telephone: (202) 514-5260
Facsimile: (202) 616-2427
Email: rachael.kamons@usdoj.gov

MARIA CHAPA LOPEZ
United States Attorney
Middle District of Florida


_____
L. RANDY HARWELL
Assistant United States Attorney
Florida Bar No. 714623
United States Attorney's Office
Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, FL 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
Randy.Harwell@usdoj.gov


Of Counsel:
ROBERT CAPLAN
Senior Attorney
U.S. EPA Region 4
61 Forsyth Street, S.W.
Atlanta, GA 30303-8960
Telephone: (404) 562-9520

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

## DEFENDANTS

CF Industries, Inc.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Outside this District
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Rachael Amy Kamons, Environmental Enforcement Section, U.S. Department of Justice, P.O. Box 7611, Washington, DC 20044-7611, 202-514-5260

Attorneys *(If Known)*
Henry C. Eisenberg, Skadden, Arps, Slate, Meagher & Flom LLP, 1440 New York Avenue, N.W., Washington, D.C. 20005-2111, 202-371-7155

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government Plaintiff

☐ 3   Federal Question
        *(U.S. Government Not a Party)*

☐ 2   U.S. Government Defendant

☐ 4   Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights<br>☐ 830 Patent | ☐ 430 Banks and Banking<br>☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud<br>☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☒ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:**<br>☐ 540 Mandamus & Other | ☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from Another District *(specify)*
☐ 6  Multidistrict Litigation - Transfer
☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 113(b) of the Clean Air Act (CAA), 42 U.S.C. 7413
Brief description of cause:
Civil penalties for modifications without meeting permit requirements

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
07/24/2020

SIGNATURE OF ATTORNEY OF RECORD
/s/ Rachael Amy Kamons

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____